UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Hornbeck Offshore Operators, LLC, Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | Civil Action No. 2:26-cv-00641 |
| United States Coast Guard Defendant. | Section:  (   ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Hornbeck Offshore Operators, LLC ("Hornbeck") brings this Complaint for Declaratory and Injunctive Relief against the United States Coast Guard (the "USCG").

### I.    NEED FOR ACTION

1. Hornbeck owns and operates a fleet of offshore supply and multi-purpose support vessels chartered for various maritime operations, including oil and gas exploration, oilfield services, offshore construction, and military missions. Under its time charters, Hornbeck crews the vessel while charterers and their personnel live—and sometimes work—aboard.

2. In December 2022, Congress passed the Safer Seas Act ("SSA"), 46 U.S.C. §§ 3106, 4901, 10104, 11101, to confront instances of sexual harassment and assault of vessel crew aboard certain types of vessels. The SSA's solution was targeted and specific—vessel owners must, among other things, install surveillance equipment in passageways leading to <u>crew</u> staterooms.

3. Hornbeck did not wait to be told twice. After the SSA's passage, Hornbeck proactively engaged the USCG to ensure full compliance. Critically, Hornbeck directly inquired with the USCG about whether the surveillance requirement extended to passageways leading to dormitories occupied by non-employee persons that are not members of a vessel's crew. The USCG unequivocally responded that it did not.

4. But then, the USCG reversed course. Suddenly, the USCG began to interpret the SSA

to require surveillance in passageways leading to all dormitories—including those occupied by non-employee persons that are not members of the vessel's crew. Under this new (and incorrect) reading, the USCG began issuing citations to Hornbeck's vessels. These citations are not toothless; in fact, they have the power to adversely impact Hornbeck's business by geographically restricting or even docking Hornbeck vessels, many of which are actively on charter or soon will be with non-employee persons that are not members of the vessel's crew.

5. To prevent this harm, Hornbeck seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, of the USCG's erroneous reading of the SSA as requiring surveillance equipment in passageways leading into dormitories occupied by non-employee persons that are not members of the vessel's crew. Judicial review by this Court will remedy the harm that Hornbeck will suffer as a result of the USCG's misinterpretation of the SSA.

## II.   PARTIES

6. Plaintiff Hornbeck Offshore Operators, LLC is a Delaware limited liability company headquartered in Covington, Louisiana.

7. Defendant United States Coast Guard is an agency of the United States within the Department of Homeland Security. The Coast Guard is, and was at all times relevant hereto, an administrative agency of the United States Government subject to the APA with regard to its rulemaking actions. *See* 5 U.S.C. § 551.

## III.   JURISDICTION AND VENUE

8. This is a judicial review action under the APA. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Moreover, this Court is authorized to issue the non-monetary relief sought herein pursuant to the APA, 5 U.S.C. §§ 702, 705, 706.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B)–(C) because a substantial part of the events or omissions giving rise to Hornbeck's claims occurred in the Eastern

District of Louisiana and because Hornbeck resides within the Eastern District of Louisiana and this action does not involve real property.

## IV.    FACTUAL ALLEGATIONS

**A.    Hornbeck owns and operates vessels that accommodate Hornbeck-employed crew and charterer-employed persons that are not members of a vessel's crew.**

10.    Hornbeck is a leading supplier of marine transportation services to exploration and production, oilfield service, offshore construction, and military customers. More specifically, Hornbeck owns and operates a fleet of offshore supply vessels and multi-purpose support vessels that are capable of providing a wide variety of services to customers that charter Hornbeck's vessels.

11.    Hornbeck's customers time-charter Hornbeck-owned vessels for various purposes to be used in the manner the customers direct. These charters often involve the onboard presence of individuals employed by (or subcontracted to) Hornbeck customers. These individuals are neither part of the vessel's crew nor employed by Hornbeck; rather, they are hired and supervised by Hornbeck's customers (or their respective contractors and subcontractors). The number of such non-employee persons that are not members of a vessel's crew on a Hornbeck vessel can span from a handful to over a hundred.

12.    An example of a service performed by Hornbeck is the provision of so-called "flotel" services whereby Hornbeck provides for the accommodation and transportation of customer personnel. The customer personnel spend their working hours on an offshore platform and return to the vessel during their off-hours. Another example is when a customer uses a vessel as a platform from which to perform offshore activities. For example, non-employee persons that are not members of a vessel's crew operate remotely operated vehicles or ROVs from the Hornbeck vessel for offshore deep-water oil and gas exploration, construction, and maintenance activities.

13.    Regardless of the specific voyage or underlying offshore operation, Hornbeck employs and supervises the vessel's crew, while the charterer (or its subcontractor) employs and oversees the

persons it has invited onto the vessel that are not members of the crew.[1] The distinction between Hornbeck crew, as compared to charterer (or subcontractor) employees is clear and maintained—delineated by billets, uniforms, and housing arrangements—onboard all Hornbeck vessels.

14.     Hornbeck regularly installs portable accommodation modules ("PAMs")[2] on its vessels that meet customer specifications for non-employee persons that are not members of a vessel's crew to be quartered. PAMs create enough indoor space on the vessel for the non-employee persons that are not members of a vessel's crew to sleep, eat, and relax after work. These PAMs supplement the space available in the "house" of the vessel, where Hornbeck's crews' staterooms are located.[3]

**B.     Congress passes the Safer Seas Act.**

15.     In December 2022, Congress enacted the SSA in an effort to eliminate instances of sexual assault and sexual harassment aboard U.S.-flag vessels and certain foreign flag vessels operating on the U.S. outer continental shelf for extended periods of time. The SSA is aimed at protecting persons serving as crew on a vessel as opposed to vessel passengers and non-employee persons that are not members of a vessel's crew.

---

[1] This case does not concern "bareboat charters," i.e., charters wherein the charterer charters an unmanned vessel and crews the vessel entirely. Rather, this case concerns HOS vessels chartered by "time charterers," defined in 33 C.F.R § 160.202 as "the party who hires a vessel for a specific amount of time, [where the] owner and his crew manage the vessel, but the charterer selects the ports of destination."

[2] Similar to PAMs, Hornbeck sometimes installs "annexes" on vessels for the same reason. Although the method of securing an annex differs from that of a PAM, both components are contemplated for additional housing for non-employee persons that are not members of a vessel's crew. For the purposes of this complaint, Hornbeck uses the term PAM as being inclusive of the term annex.

[3] This is not to say that no Hornbeck employee has ever been housed in a PAM. But, as a matter of practice and intended operation, PAMs are used for non-employee persons that are not members of a vessel's crew. Going forward, when the SSA's application is confirmed, Hornbeck will ensure strict compliance on PAMs.

16. To help achieve this goal, the SSA imposes requirements for non-passenger vessels, including requirements that the vessel owner implement reporting, training of the vessel owners' personnel, and installation and notification of surveillance requirements in crew passageways.

17. As it pertains to Hornbeck's request for judicial review, 46 U.S.C. § 4901 imposes requirements relating to audio and visual surveillance of crew passageways aboard non-passenger vessels. The relevant part of the statute follows:

**(c) Placement of Video and Audio Surveillance Equipment.**

. . . .

**(2) Locations.**

Video and audio surveillance equipment shall be placed in passageways on to which doors from staterooms open. Such equipment shall be placed in a manner ensuring the visibility of every door in each such passageway.

**(d) Notice of Video and Audio Surveillance.**

The owner of a vessel to which this section applies shall provide clear and conspicuous signs on board the vessel <u>notifying the crew</u> of the presence of audio and video surveillance equipment.

**(e) Access to Video and Audio Records.**

The owner of a vessel to which this section applies shall ensure that access to records of video and audio surveillance is not used as part of a labor action <u>against a crew member</u> or employment dispute unless used in a criminal or civil action.

§ 4901(c)–(e) (emphasis added).

**C.     Hornbeck complies with the Safer Seas Act.**

18. To ensure it was in complete compliance with the SSA, Hornbeck maintained regular communication with the USCG Sector Houma and sought clarification on numerous details of the SSA. As part of its many communications about the SSA and its requirements, Hornbeck inquired whether the SSA required that cameras be installed in passageways leading to dormitory areas for non-crew personnel. The USCG affirmatively instructed Hornbeck in writing that the SSA does <u>not</u> require that cameras be installed in PAMs or other areas housing non-employee persons that are not members

of a vessel's crew: a marine inspector with the USCG Sector Houma stated that "[t]he Annex's [sic] installed on the vessel are not required to have cameras and signage installed so long as crew members for the vessel are not housed in those units."

19.     Relying on this guidance, Hornbeck retrofit thirty-eight vessels in its fleet. At the cost of millions of dollars and more than 1,000 man hours, Hornbeck installed compliant video and audio surveillance equipment throughout the passageways into which Hornbeck's crews' staterooms opened. Consistent with SSA's requirements, the video and audio surveillance equipment was "placed in a manner ensuring the visibility of every door in each such passageway." § 4901(c)(2).

20.     Similarly, in compliance with the SSA, Hornbeck posted notices in the same areas to "notify[ ] the crew of the presence of audio and video surveillance equipment." § 4901(d).

21.     Also consistent with the SSA, Hornbeck adopted policies to "ensure that access to records of video and audio surveillance [would] not [be] used as part of a labor action against a crew member or employment dispute unless used in a criminal or civil action." § 4901(e).

**D.      The USCG deems Hornbeck noncompliant.**

22.     Despite the USCG's written statements provided to Hornbeck, shortly after the SSA became effective and enforceable, the USCG, without explanation, arbitrarily reversed the position it had previously given to Hornbeck. Soon thereafter, the USCG began issuing Hornbeck Coast Guard-835V Deficiency Notices ("CG-835V") to vessels that did not have surveillance equipment in PAMs. CG-835Vs are notice of non-compliance with legal requirements pertaining to the vessel and can lead to significant consequences for the vessel owner—consequences over which the Coast Guard has wide discretion.

23.     On October 6, 2025, the USCG Sector Virginia issued HOS BLACK FOOT a CG-835V based on its alleged non-compliance with § 4901.

24.     On October 16, 2025, USCG Sector Virginia issued HOS ROSEBUD a CG-835V on

the same basis.

25.    On October 27, 2025, USCG Sector Houma issued HOS BLACK ROCK a CG-835V on the same basis.

26.    On January 14, 2026, USCG Sector Houma issued HOS BAYOU a CG-835V on the same basis.

27.    On November 4, 2025, Hornbeck initiated a formal appeal of the CG-835Vs. Hornbeck sought reconsideration of the CG-835Vs to the respective USCG units. In its request for reconsideration, Hornbeck noted that the plain wording of § 4901 only requires surveillance equipment in passageways leading to crewmembers' staterooms and that the USCG had previously (and correctly) read the statute this way.

28.    On December 4, 2025, Officer in Charge, Marine Inspection ("OCMI") Sector Virginia denied Hornbeck's request for reconsideration of the CG-835Vs for HOS BLACK FOOT and HOS ROSEBUD. The OCMI Sector Houma likewise denied Hornbeck's request for reconsideration of the CG-835Vs for HOS BLACK ROCK and HOS BAYOU.

29.    On December 11, 2025, Hornbeck submitted an appeal to the Commander, United States Coast Guard, East Coast District, contesting the OCMI Sector Virginia's denial of the request for reconsideration.

30.    On January 15, 2026, the East Coast District Commander denied Hornbeck's appeal, upholding the OCMI Sector Virginia's denial of the request for reconsideration regarding the CG-835Vs for HOS BLACK FOOT and HOS ROSEBUD.

31.    On January 30, 2026, Hornbeck appealed the CG-835Vs as to HOS BLACK FOOT and HOS ROSEBUD to the Commandant, Chief of CVC.

32.    On March 11, 2026, the Commandant, Chief of CVC issued a decision denying Hornbeck's appeal (the "Agency Action"), upholding the CG-835Vs issued to HOS BLACK FOOT

7

and HOS ROSEBUD.

33.     The Agency Action was a final agency action under the APA.

34.     In the wake of the Agency Action, the USCG has continued to issue similar CG-835Vs based on the USCG's erroneous interpretation of the SSA. Most recently, on March 18, 2026, the USCG Sector Houma issued HOS MYSTIQUE a CG-835V on the basis that the vessel does not have surveillance equipment in its PAMs in violation of § 4901.

**E.     The SSA does not require surveillance equipment in dormitory areas for non-employee persons that are not members of a vessel's crew.**

35.     The plain wording, structure, and purpose of the SSA confirm that Congress intended the surveillance requirements in § 4901 to apply only to passageways leading into staterooms occupied by crewmembers—not dormitory areas for non-employee persons that are not members of a vessel's crew.

36.     Section 4901(c)(2) requires surveillance equipment in passageways leading to staterooms: "Video and audio surveillance equipment shall be placed in passageways on to which doors from staterooms open." Neither the SSA, nor the applicable subtitle, 46 U.S.C. § 2101, provide a specific definition of "stateroom." Despite the lack of an express definition, Congress's intent to limit surveillance to the "stateroom" accommodations of the vessel's <u>crew</u> is clear because § 4901, as a whole, applies <u>only to the vessel's crew and crew-related areas</u>.

37.     The very next subsection, § 4901(d), states that "[t]he owner of a vessel to which this section applies shall provide clear and conspicuous signs on board the vessel notifying the <u>crew</u> of the presence of video and audio surveillance equipment." (emphasis added). The implication is clear: the individuals being surveilled (and thus receiving notice of ongoing surveillance) are the <u>crew</u>.

38.     Section 4901(e) goes on to require that "[t]he owner of a vessel to which this section applies shall ensure that access to records of video and audio surveillance is not used as part of a labor action against a <u>crew member</u> or employment dispute unless used in a criminal or civil action."

8

(emphasis added).

39.    Section 4901(c)(2)'s location directive, read in the context of § 4901 as a whole, requires vessel owners and operators to install surveillance equipment in passageways onto which doors from crew staterooms open.

40.    Crewmembers are defined as "all persons carried on board the vessel to provide navigation and maintenance of the vessel, its machinery, systems, and arrangements essential for propulsion and safe navigation or to provide services for other persons on board." 33 C.F.R. § 160.022.

41.    The non-employee persons that are not members of a vessel's crew for which Hornbeck provides accommodations do not assist in the navigation or maintenance of the vessel, its machinery, systems, or arrangements essential for propulsion or safe navigation. Nor do they provide services for other persons on board. These workers are not "crewmembers" of Hornbeck's vessels.

42.    In several other relevant complimentary areas of legislation and regulation, the distinction between a vessel's crew and non-employee persons that are not members of a vessel's crew proves clear and distinct. For example, 46 C.F.R 90.10–15 defines "industrial personnel" (as opposed to a vessel's crew) as "every person carried on board an industrial vessel for the sole purpose of carrying out the industrial business or functions of the industrial vessel." The regulation provides examples which perform functions outside those of a vessel's crew: "tradesmen, such as mechanics, plumbers, electricians, and welders; laborers, such as wreckers and construction workers; and other persons, such as supervisors, engineers, technicians, drilling personnel, and divers." Similarly, in 33 C.F.R 141.15(b), "industrial personnel" are distinguished from "crew" in the regulatory text:

> As used in [the regulation] "regular complement of a unit" means those personnel necessary for the routine functioning of the unit, including marine officers and crew; industrial personnel on the unit, such as toolpushers, drillers, roustabouts, floor hands, crane operators, derrickmen, mechanics, motormen, and general maintenance personnel; and support personnel on the unit, such as cooks, stewards and radio operators. The term does not include specialists, professionals, or other technically

9

trained personnel called in to handle emergencies or other temporary operations; extra personnel on a unit for training; and other personnel temporarily on a unit for specialized operations, such as construction, alteration, well logging, or unusual repairs or emergencies.

And the definition section of the relevant code, while defining a passenger for offshore vessels in particular, similarly maintains the distinction between crew and non-employee, non-crew offshore workers. *Compare* § 2101(29)(B)(ii) ("an employee of the owner, or of a subcontractor to the owner, engaged in the business of the owner") and § 2101(29)(B)(iii) ("an employee of the charterer, or of a subcontractor to the charterer, engaged in the business of the charterer") *with* § 2101(29)(B)(iv) ("an individual employed in a phase of exploration, exploitation, or production of offshore mineral or energy resources served by the vessel").

43.     Other portions of the SSA establish that the SSA applies to crew. By way of example, the SSA amended 46 U.S.C. § 10104 to institute "mandatory reporting by the responsible entity of the vessel" i.e., its owner, for "any complaint or incident of harassment, sexual harassment, or sexual assault in violation of employer policy or law." The SSA further required that vessel owner's Safety Management Systems contain policies against sexual assault and sexual harassment. These non-exclusive exemplars establish that Congress intended § 4901 to require surveillance equipment in passageways leading to staterooms housing crew.

**F.     Hornbeck has complied with the SSA's actual requirements; meeting the USCG's additional demands harms Hornbeck.**

44.     The Agency Action has harmed and continues to harm Hornbeck.

45.     If forced to comply with § 4901 as interpreted in the Agency Action, Hornbeck would be required to purchase and install additional surveillance equipment. Hornbeck likewise faces loss of revenue from its fleet while its vessels are removed from service to be outfitted with additional surveillance equipment.

46.     The USCG has wide discretion in imposing restrictions on vessels under CG-835Vs.

The USCG may geographically limit where a vessel is allowed to sail, impose a no sail order, or impose any number of other restrictions that it deems fit. Any such restriction would impact Hornbeck's vessels' ability to fulfill their charter obligations and/or obtain future charter engagements and cause financial and reputational harm to Hornbeck. Any of these actions could significantly limit Hornbeck's ability to market its vessels and chill customer interest in such vessels that are under the threat of USCG enforcement actions.

47. This harm to Hornbeck cannot be remedied because Hornbeck cannot recover the improper costs against the USCG. Nor can Hornbeck extend the operable life of the vessels in question.

48. Hornbeck will also be harmed if it is forced to comply with an unlawful agency action.

## V. CAUSE OF ACTION

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

49. Hornbeck realleges all allegations above as though restated here.

50. Under 5 U.S.C. § 706(2)(A), reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

51. For decades, courts were expected to give deference to the interpretation of administrative agencies. *See generally*, *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In overruling the doctrine of *Chevron* deference to administrative agency interpretations, the United States Supreme Court mandated that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Moreover, the Supreme Court emphasized that "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413. In reviewing the Agency Action, this Court should apply the APA's

11

standards without deference to the USCG's interpretation of ambiguous statutory provisions and instead exercise independent judgment as to the meaning of § 4901 and whether the USCG acted within its statutory authority. The USCG's interpretation expands the SSA beyond its text and structure and therefore cannot be sustained under this Court's de novo review.

52.    The Agency Action violates the APA because it is arbitrary and capricious and contrary to law. In reversing its original (correct) interpretation of the SSA, the USCG, without justification, expanded the application of the SSA beyond its terms.

53.    The Agency Action is arbitrary and capricious because it failed to consider that Congress, in § 4901(d)–(e), framed the notice and use-of-footage provisions expressly in relation to crewmembers, which confirms that the surveillance mandate in § 4901 targets passageways to crew staterooms, not dormitory areas for non-employee persons that are not members of a vessel's crew.

54.    The Agency Action is "otherwise not in accordance with law" because the Commandant, Chief of CG-CVC interpreted the statute in a manner that exceeded the bounds of the statute's text and structure. The Commandant, Chief of CVC's reading collapsed the statute's express focus on crew in § 4901(d)–(e) into a boundless requirement, covering dormitory areas for non-employee persons that are not members of a vessel's crew, by disregarding textual limits that Congress used to delineate the scope of the SSA.

55.    The Agency Action evinces a clear error of judgment by extending § 4901 to require surveillance in passageways serving dormitory areas for non-employee persons that are not members of a vessel's crew, and failing to consider that § 4901, read as a whole, limits the definition of "stateroom" to accommodations of a vessel's crew.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Hornbeck respectfully requests that this Court:

56.    Hold unlawful and set aside the Commandant, Chief of Commercial Vessel

Compliance (CG-CVC) Corydon F. Heard IV's final agency decision as arbitrary, capricious, and contrary to procedures required by law;

57.      Remand the subject final agency decision to the USCG for revision and review consistent with the decision of this Court;

58.      Preliminarily and permanently enjoin the Commandant, Chief of Commercial Vessel Compliance (CG-CVC) Corydon F. Heard IV's interpretation of 46 U.S.C. § 4901 as requiring surveillance equipment in dormitory areas for non-employee persons that are not members of a vessel's crew;

59.      Preliminarily and permanently enjoin the effect of the existing and any future CG-835Vs issued on the basis of the USCG's erroneous interpretation of 46 U.S.C. § 4901;

60.      Award Hornbeck costs and reasonable attorneys' fees as appropriate; and

61.      Award Hornbeck such further and other relief as this Court deems proper.

Dated: March 25, 2026

Respectfully Submitted,

*/s/ Claire B. Curwick*

Claire B. Curwick (LA Bar No. 39809)
Lauren M. Perry (LA Bar No. 40012)
BURNS CHAREST LLP
201 Saint Charles Avenue, Suite 2900
New Orleans, Louisiana 70170
Tel.: (504) 799-2845
Fax: (504) 881-1765
ccurwick@burnscharest.com
lperry@burnscharest.com

Daniel H. Charest (to be admitted *pro hac vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel.: (469) 904-4550
Fax: (469) 444-5002
dcharest@burnscharest.com

Counsel for Hornbeck Offshore Operators, LLC